Domer SCARAMUCCI and William A. Moore, Appellants,

v.

DRESSER INDUSTRIES, INC., Appellee.

No. 255-69.

United States Court of Appeals, Tenth Circuit.

June 5, 1970.

Rehearing Denied Aug. 28, 1970.

Jerry J. Dunlap, Oklahoma City, Okl., for appellants.

Howard E. Moore, Dallas, Tex. (Crowe, Dunlevy, Thweatt, Johnson & Burdick, James A. Peabody, and Ben L. Burdick, Oklahoma City, Okl., on the brief), for appellee.

Before MURRAH, HILL and HICKEY, Circuit Judges.

HILL, Circuit Judge.

Domer Scaramucci, owner of patents 3,266,384 (hereinafter '384) and 3,266,-386 (hereinafter '386) and William Moore, d/b/a Bell Rubber Company, exclusive licensee of Scaramucci under these patents, instituted this suit claiming that Dresser Industries has and continues to infringe the aforesaid patents. A second cause of action for unfair competition is based on allegations that Dresser Industries illegally delayed issuance of patents '384 and '386 by instituting interference proceedings subsequent to the latter's application for a patent on a similar device. Dresser answered denying (1) the validity of patents '384 and '386; (2) the infringement of those patents; (3) the claim of unfair competition; and further counterclaimed (1) for a declaratory judgment that '384 and '386 were invalid and not infringed; (2) for a judgment that appellants had infringed patent 3,352,212 (hereinafter '212) owned by Norman W. Read; and (3) for a judgment that appellants were acting in violation of the antitrust laws by attempting to enforce a fraudulently obtained patent.

The controversy was tried to the court without a jury. After entering extensive findings of fact the court concluded: (1) that the '384 and '386 patents were invalid and not infringed; (2) that the cause of action for unfair competition be dismissed; (3) that patent '212 was not infringed; and (4) that the cause of action for antitrust violations be dismissed. Scaramucci and Moore appeal from (1) and (2).

The '384, '386 and '212 patents in controversy all relate to what is known in the art as "all rubber" swab cups. These devices are used in swabbing tubing or casing of an oil or gas well when it is being completed or worked over. In its most rudimentary design, a swab cup consists of an annular piece of rubber mounted on a metal column. On the annular piece of rubber are resilient lips which are molded outward from the center piece to form a seal with the wall of the tubing. In the swab cups in con-

troversy the annular piece of rubber is of just slightly lesser radial diameter than the sealing lips and forms a support for the respective sealing lip. Whether the swab cup is all rubber or has wire reinforced resilient lips, its fundamental operation is to elevate fluid out of a well. To accomplish this two or more swab cups are mounted on a fluted mandrel and the assembly is lowered on a cable into a well containing oil or gas. As the assembly is lowered through the liquid the swab cups slide upward on the mandrel, allowing the liquid to bypass up through the openings between the reinforcing portions of the swab cups and the flutes in the mandrel. A second method of providing for free passage of fluid as the devices are lowered is to use swab cups smaller in diameter than the inner dimension of the well tubing, thereby allowing the fluid to flow around the outer edge of the assembly. When the unit reaches the desired depth the cable is pulled taut and rewound, causing the swab cup assembly to ascend.

As the unit begins its ascent, the mandrel is raised a short distance through the swab cups and the lower swab cup seats on the lower end of the mandrel to close the flute opening. As the column of liquid above the assembly is raised, the sealing lips on the swab cups are forced down and out into a sealing configuration with the wall of the tubing. By lifting the oil or gas in such manner, a suction condition is created beneath the swab cup assembly which hopefully will cause the well to flow.

Due to varying geological conditions and completion techniques, a multitude of swab cups have been designed, patented and manufactured. The wire reinforced cups are desirable because of the heavy loads—from 1500 to 2000 feet of fluid—they will lift. Their strength and durability stems from the wires embedded in the sealing lips. Their weakness is in the tendency to lodge in coupling recesses, causing delays while they are "fished" out. All rubber cups are particularly desirable for the plastic and tubingless completions because, unlike wire reinforced cups, they present no problem if they are stripped off due to the excessive loads. Also, if the load is not too excessive they will "dump" or allow fluid to bypass until a maintainable load is reached. The disadvantage here is in the light lifting capacity which requires repeated trips to swab deep wells.

In the late 1950's, well operators began to demand a cup which combined the best features of the wire reinforced and all rubber cups. That is, they wanted an all rubber cup that would lift greater volumes of liquid. This customer demand was related to Bell Rubber Company and its swab cup designer, Scaramucci; to the Guiberson Corporation [Dresser Industries' predecessor] and Read, its swab cup designer; and to Oil States Rubber Company and its swab cup designer, Waldrop. The results produced by all three inventors are structurally and functionally akin. Each apparently used the basic design of the most popular all rubber cup and improved on it by providing a support beneath the sealing lip which would support the lip and prevent it from turning over and dumping fluid. Waldrop was the first to patent his version of the new concept. In March, 1961, Bell Rubber Company marketed Scaramucci's XEL cup. After the XEL cup was on the market, Read developed, tested and marketed the TA cup.

On November 24, 1961, Scaramucci filed an application for the '384 patent. In its basic design, the invention comprised an annular sleeve of resilient material bonded about a metal cylindrical member, and an annular, flexible lip of resilient material integrally formed with the sleeve at the upper end thereof and extending radically outward toward the tubing wall. The resilient sleeve has a thick, load-carrying portion of lesser diameter than the minimum internal diameter of the tubing string which is, functionally, a support for the flexible lip. The spacing of the flexible lip from the load-carrying support is such that when the swab assembly is fully loaded

hydrostatically, the lip is biased into sealing engagement with the tubing wall, and is simultaneously placed in abutting contact with the load-carrying part of the resilient sleeve. The support body thus reinforces and supports the lip to prevent the flexible lip's inversion resulting in a dumping of fluid.

While the '384 application was pending, Waldrop's patent No. 3,023,062 (hereinafter the Waldrop Patent) was issued and was cited by the Examiner as a reference to reject the Scaramucci claims. Scaramucci copied the claims from the Waldrop Patent and requested declaration of an interference to determine priority of invention. Scaramucci was unsuccessful in the interference and Waldrop was awarded priority. Scaramucci then amended his claims to distinguish his device from the Waldrop Patent. The claim for novelty in '384 [1]

1. Claims 9–21 of the '384 patent are in issue. Claim 11 may be considered representative and reads as follows:

"11. In a well swab for swabbing the inner periphery of, and lifting fluid from, oil well tubing and the like, comprising:

A reinforcing sleeve of a size to be inserted in the tubing;

A plurality of annular, resilient lips bonded around the sleeve in spaced relation along the length of the sleeve, each of said lips being responsive to fluid loading for flexure into sealing engagement with the inner periphery of the tubing; and

A plurality of annular bodies of resilient material bonded around the sleeve, each body being positioned to support and be distorted by one of said lips when the respective lip is flexed in response to fluid loading, each of said bodies having an outer surface parallel with the inner periphery of the tubing, and the length of each of said bodies, along said outer surface thereof, being greater than the radial thickness of the respective body measured from said outer surface thereof to the outer periphery of said sleeve."

2. Claims 1, 2, 4, 5 and 6 of the '386 patent are in issue, and claim 5, which may be considered representative, reads as follows:

"5. A swab cup for swabbing fluid from a well tubing by pulling the swab cup upwardly through the tubing comprising:

is the provision for a flexible sealing lip with a resilient support thereunder, which support is longer, when measured on the outer surface parallel to the tubing wall, than the radial width thereof, creating what Scaramucci calls a "column." It is claimed that the support reinforces the flexible sealing lip when under a load, and expands and "barrels" outward into sealing engagement to form a secondary seal with the pipe so as to prevent any dumping action. The only way to retrieve the mechanism when under excessive load is to strip off the sealing lip and support body.

Scaramucci's patent '386 [2] is a claimed improvement over '384 and consists of manufacturing the swab cup so the sealing lip, when in a relaxed condition, is of less diameter than the inner diameter of the tubing.

A rigid sleeve having an upper, and a lower end;

at least two flexible lips of resilient material molded around the sleeve in vertically spaced relation, each of said lips extending upwardly and outwardly from the sleeve and having an outer diameter, in the relaxed condition thereof, less than the inner diameter of the tubing,

and being responsive to fluid pressure above the lip for downward flexure into sealing engagement with the inner wall of the tubing; and

a column of resilient material molded around the sleeve below each lip in a position to support the respective lip when the lip is flexed into sealing engagement with the inner wall of the tubing;

each of said columns, in its relaxed condition, having an outer surface parallel with the inner periphery of the tubing and an outer diameter less than the inner diameter of the tubing for freedom of downward movement of a swab cup through the tubing;

the length of each of said columns, measured along the outer surface thereof, being greater than the wall thickness of the respective column for distortion of said outer surface into sealing engagement with the inner periphery of the tubing when the swab cup is lifting fluid through the tubing to prevent the respective lip supported by the respective column from inverting and dumping the fluid being lifted."

While applications for patents '384 and '386 were pending, Read, on May 3, 1962, filed an application which eventually matured into '212. The Dresser TA cup (Read's claimed invention) and the XEL cup are very similar in design and function. The only apparent significant difference is that the support "columns" in the XEL cup are of substantially the same vertical length, whereas the support bodies in the TA cup are of increasing vertical length from the uppermost support to the lowermost support. The Patent Office cited the Scaramucci patents '384 and '386 as references to the Read claims and interferences were declared on patents '384, '386 and '212. Read sought dissolution on the grounds that Jenks Patent No. 214,919 and Crickmer Patent No. 2,358,908 read on Scaramucci's claims. Scaramucci's motion to dissolve urged that Read's claims were not disclosed in Figures I–XII of the original application and that none of the Scaramucci counts read on Read. The Examiner determined that

two of the Scaramucci counts read on Read;[3] that one of Scaramucci's counts was unpatentable over Waldrop;[4] and that neither Jenks[5] nor Crickmer[6] read on the '384 claims. The Commissioner of Patents denied appellee's petition for review because there was no manifest error in the Examiner's decision.

■ The rules of law which govern the case are well settled in this Circuit. Although the ultimate question of patent validity is a legal question for the court to decide,[7] it involves factual issues such as anticipation of prior art and obviousness.[8] Those factual questions, when decided in findings by the trial court, are reversible on appeal only upon a finding of clear error.[9] A regularly issued patent is presumed valid and where the Patent Office has considered prior art in accepting or rejecting an allegation of anticipation, the presumption is strengthened.[10] When attacking the validity of a patent under 35 U.S.C.A. § 102, it is necessary for the challenging

3. The Scaramucci counts read that the support columns were parallel with the inner surface of the tubing and when measured at the outer surface, the columns were longer than their radial width. All of the Read counts, save two, read that the support members had a slight taper at the lower end of the outer surface, so that the entire outer surface which was parallel to the inner surface of the tubing was not longer than the radial width.

4. The Waldrop patent discloses in Figure 4 that it has load carrying supports having a vertical length substantially equal to the radial thickness of the support. The Examiner ruled: "Whether the vertical length of each support at the stipulated point were made a $\frac{1}{16}$" shorter or a $\frac{1}{16}$" longer (or some other variant) than that depicted would be purely a design consideration."

5. Jenks did not read on the '384 counts because in Jenks the sealing lip was not bonded to the sleeve, as it was in '384.

6. Crickmer did not read on the '384 counts because the support body in Crickmer was made of "hardened material," ruling out flexibility which would permit the "barreling" effect.

7. McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381, 390 (10th Cir. 1965);

Mott Corp. v. Sunflower Industries, Inc., 314 F.2d 872, 878 (10th Cir. 1963); Admiral Corp. v. Zenith Radio Corp., 296 F.2d 708, 712 (10th Cir. 1961); Sitton Septic Tank Co. v. Honer, 274 F.2d 811, 813 (10th Cir. 1959); Consolidated Electro. Corp. v. Midwestern Instruments, 260 F.2d 811, 815 (10th Cir. 1958).

8. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Eimco Corp. v. Peterson Filters and Engineering Co., 406 F.2d 431, 436 (10th Cir. 1968); McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d at 391; Admiral Corp. v. Zenith Radio Corp., 296 F.2d at 714.

9. *Id.*

10. Eimco Corp. v. Peterson Filters and Engineering Co., 406 F.2d at 434; King-Seeley Thermos Co. v. Refrigerated Dispensers, Inc., 354 F.2d 533, 536 (10th Cir. 1965); Mott Corp. v. Sunflower Industries, Inc., 314 F.2d at 877; Admiral Corp. v. Zenith Radio Corp., 296 F.2d at 712; Bewal, Inc. v. Minnesota Mining and Mfg. Co., 292 F.2d 159, 163–164 (10th Cir. 1961); Sitton Septic Tank Co. v. Honer, 274 F.2d at 813; Consolidated Electro Corp. v. Midwestern Instruments, 260 F.2d at 815.

party to prove by clear and convincing evidence [11] that all the elements of the invention, or their equivalents, are found in a single structure or description where they do substantially the same work in substantially the same way.[12] It is universally held that a mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than previously performed or produced by them, is not a patentable invention.[13] To establish anticipation where there is an aggregation of elements old in the art, it is sufficient if the whole of the prior art considered together discloses all of the claimed elements and that no new functional relationship arises from their combination.[14] The test of whether a particular patent is a mere aggregation and invalid or a combination and valid has been variously stated. Generally, where elements old in the art are united in such a way that a new and useful result is secured or an old result is attained in a more facile, economical and efficient manner, there is a patentable invention.[15]

■■■ Dresser's invalidity argument it twofold. First, it is submitted that patents '384 and '386 are invalid under 35 U.S.C.A. § 102 as being anticipated by prior art. Second, under 35 U.S.C.A. § 103 it is contended that the novel features claimed in both Scaramucci patents would be obvious to persons having ordinary skill in the art. We address ourselves first to the § 102 charge of anticipation. This argument is further broken down into two parts: (1) that Scaramucci's patents aggregate individual elements of prior art devices which perform no new function; and (2) that the Waldrop patent itself wholly anticipates patents '384 and '386.

The following prior art patents are relied on to prove invalidity: Jenks Patent No. 214,919, issued in 1879; Ferris Patent No. 2,352,700, issued in 1944; Crickmer Patent No. 2,358,908, issued in 1944; Johnson Patent No. 2,702,220, issued in 1955; Waldrop Patent No. 3,023,062, issued in 1962; and the unpatented Guiberson GW cup which was continuously marketed since 1939.

The Jenks patent discloses a mechanism consisting of a metal stem around which is fitted "neatly but not tightly" a cylindrical or barrel-shaped block of rubber called a "packer." When under hydrostatic pressure, the middle portion of the packer is convexly expanded into sealing engagement with the well tubing. A cup may be added at the upper end of the packer which will also act as a sealing lip when under pressure. This patent was considered by the Patent Office Examiner who held the packer to be a "column" as read on the Scaramucci claims and that the "column" expanded firmly against the well tubing to prevent dumping. Patents '384 and '386 were held patentable over Jenks because the flexible lip and packer were not integrally formed and because the flexible lip and packer were not bonded to the metal stem as was the case in Scaramucci. The trial court found that Jenks had the identical function as Scaramucci even without the bonding and that the bonding distinction was wholly without merit.

Appellants claim clear error in this finding on the grounds that the testimony of appellee's expert was subject to

11. *Id.*

12. McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d at 398; Griswold v. Oil Capital Valve Co., 375 F.2d 532, 537 (10th Cir. 1966).

13. Great A. & P. Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 151, 71 S.Ct. 127, 95 L.Ed. 162 (1950); McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d at 393 and cases cited therein.

14. *Id.*; Doran Coffee Roasting Co. v. Wyott Mfg. Co., 267 F.2d 200 (10th Cir. 1959); Hollywood-Maxwell Co. v. Street's of Tulsa, 183 F.2d 261 (10th Cir. 1950).

15. McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d at 393 and cases cited therein.

impeachment and that the function of the two devices was substantially variant. Appellee's expert stated that even though Jenks was not bonded, the function of the packer was substantially identical to that of the "column" support in '384 and '386 and that while Jenks was designated as a packer it was technically adequate to operate as a well swab. The evidence was conflicting on whether the Jenks packer could be used as a well swab, but giving appellee that argument, it does not appear from clear and convincing testimony and other evidence that the functions are substantially identical. As a well swab, Jenks would be suited only for light loads, due to its unbonded character; because of its bonding '384 and '386 will lift far greater loads. Upon studying the design of the Jenks patent and the testimony relating to it, we conclude that while the barreling effect may be read on Jenks, the Scaramucci claims combined that element of prior art into a device with a new and useful result; or, presuming Jenks was usable as a well swab, that result was obtained in a more facile, economical and efficient manner and was thereby patentable over Jenks.

The Ferris patent was entitled "Open Hole Removable Packer." The device was used when a well was being cemented by what is known as a "squeeze job" in which cement is forced through the tubing and off into the well formation. To accomplish this, the cement must be prevented from flowing upward along the outside of the tubing. To aid in preventing this, the device employs inverted swab cups; that is, the support is on top of an inverted resilient lip. When the pressure on the down side of the lip is greater than that on the top side (as when the cement attempts to surface) the lip is forced up and out, causing a partial seal. In addition, the pressure of the lip is transmitted upward to the base of the packer sleeve causing it to expand to make a tight seal with the uncased part of the well. The lower court decided that Ferris teaches that the resilient support would expand into

sealing engagement with the wall of the pipe or bore in which it is disclosed in the same general manner claimed in the Scaramucci patents. This finding does not appear clearly erroneous to us, but we cannot say that Ferris reads on Scaramucci and are disposed to point out that the trial court made no such finding. Thus, for the same reason as expressed regarding Jenks, Scaramucci was patentable over Ferris.

The Crickmer patent discloses a swab cup comprising an annular body of rubber or neoprene which is permanently bonded to a mandrel. The upper part of the body has an integral annular sealing lip which is distorted radically outward when under hydrostatic pressure. Figure 4 of the patent shows that the lip is flexible and the support body thereunder is of a "hardened material." The Examiner concluded that because the support was of a hardened material, it would not expand into sealing engagement with the well tubing. The trial court found that the Crickmer support body constituted a column as referred to in Scaramucci, and would have a barreling effect as well.

The evidence upon which the trial court made this finding was the testimony of appellee's expert that the support would be "squished" down as the pressure increased on the sealing lip. The degree of squishing, he testified, depended on the hardness of the material in the support body. We do not believe this to be clear and convincing evidence to overturn the strong presumption given by the Examiner's contrary conclusion. This testimony goes more to the question of obviousness and will be considered later. For now, we conclude that Crickmer did not anticipate the "barreling" effect of Scaramucci's device.

The Johnson patent is captioned as a packing cup but it specifically reads that it is suited for well swabbing. It is an all rubber swab cup with an annular body of rubber integrally related to a sealing lip at the upper end which flares outward to provide a leak proof seal. The trial court found that "the support constitutes

a column which will barrel out in the same sense as disclosed and claimed in the Scaramucci patent and anticipates the invention disclosed and claimed in the Scaramucci patents." We are unable to discover any argument on appeal regarding this finding and are constrained to agree with the trial court, based on an absence of clear error.

The Guiberson GW cup consists of an elongated support terminated at the upper end by a flexible sealing lip molded to a metallic tubular core. Under a load, the lip expands downward against the support. The trial court found: "It comprehends the improvements claimed in the Scaramucci patents in that it comprises the essential claimed improved element of the Scaramucci patents to-wit: A lip with a resilient support thereunder, with the support longer than the radial width, which is bonded to a sleeve and barrels out into sealing engagement with the pipe and will not bypass the fluid without rupturing." It is appellants' contention that these cups are functionally different. In the GW cup, the lip extends upward and when under pressure, is supported by the tubing wall, not the support member. The result is that the GW cup has a maximum tendency to balloon out into the coupling recesses and "hang up." Appellee's expert stated that the GW cup support beneath the sealing lip would "squash down * * * and barrel out against the wall of the tubing for the purpose of sealing so that oil will not be lost." The trial court relied on the latter expert's testimony and we can find nothing indicating clear error in that reliance.

The Waldrop patent discloses the idea of providing support ribs underneath the sealing lip to support the lip when flexed downward. Because of the positioning of the support rib, the sealing lips are prevented at all times from dumping as do the other all rubber cups. The singular structural difference between the patents of Scaramucci and Waldrop has reference to Scaramucci's claims which specify the supports to be longer than the radial width on the outer surface parallel with tubing's inner surface. Upon the strength of the clear and convincing testimony of appellee's expert witness, the trial court found: (1) that Waldrop taught the variation of the thickness of the support rib to vary the load carrying capacity thereof; (2) that the back-up ribs are smaller in diameter than the inner diameter of the tubing as claimed in the Scaramucci patents; (3) the Waldrop supports can be characterized as "columns" having a barreling effect; and (4) no invention was involved in making the Scaramucci supports longer than those shown in the Waldrop patent to cause it to carry a greater load because such was taught in Waldrop.

The distinction relied upon by Scaramucci is that Waldrop does not prevent the dumping of fluid. From the evidence tendered at trial and from a reading of the Waldrop patent itself, appellants' position is untenable. We deem the evidence offered by appellee sufficient to overcome the strong presumption of validity and agree fully with the foregoing findings of the trial court.

The '386 claim for novelty is in the making of sealing lips of less diameter than the inner diameter of the tubing. The evidence from appellants' own witnesses was that this was old in the art. This clearly refutes any claim of novelty.

Throughout the trial below it was Dresser Industries' burden to establish either (1) that when the entire known art is surveyed, the aggregation of the claimed elements is disclosed without a new functional relationship evolving; or (2) that when viewing the Waldrop patent, all the elements of Scaramucci's device may be found therein doing substantially the same work in substantially the same way. Insofar as the aggregation argument is concerned, we believe that Jenks, Ferris and Crickmer do not read on the Scaramucci claims and that '384 and '386 were not anticipated by those patents. We are unable to detect clear error sufficient to allow reversal of the findings regarding the anticipation by the Johnson and GW cups. And we fully concur

that clear and convincing evidence in the form of depositions, physical exhibits and expert testimony was adduced to establish that Waldrop anticipates and reads upon the claims of Scaramucci's patents.

Appellants strenuously argue on appeal that the '384 and '386 patents were not invalid by reason of obviousness under 35 U.S.C.A. § 103. Having already sustained the trial court's findings of invalidity under § 102, we will not entertain a protracted discussion of the question under § 103. We are, however, inclined to buttress the foregoing conclusions by stating that by having considered the testimony, the exhibits and findings of the trial court, the claimed improvements made over the prior art are matters of mechanical expediency, not patentable inventiveness. "To be invention, an improvement in the prior art must involve more ingenuity and skill than the work of an ordinary mechanic in the art." Mott Corporation v. Sunflower Industries, Inc., 314 F.2d 872, 879 (10th Cir. 1963).

The claimed improvement over Jenks was the bonding of the rubber to the metal sleeves. This process was old in the art at the time of the claimed invention of Scaramucci and was obvious to one of ordinary skill in the art. The claimed improvement over Crickmer was that the support member would not barrel into sealing engagement with the well pipe in the Crickmer device. Appellee's evidence at trial was that the barreling effect was directly related to the hardness of the support body. The trial court found that the act of lessening the hardness of the support was not a patentable invention; that it would be obvious to a person having ordinary skill in the art. Again, being unable to find clear error, that finding must stand. The structural and functional improvements of the Scaramucci device over the Waldrop patent is minimal if existent. We are in complete harmony with the trial court when it said: "No invention was involved in making the Scaramucci supports longer than those shown in the Waldrop Patent to cause it to carry a greater load * * * [as it] is only a matter of degree and would be obvious to a person having ordinary skill in the art at the time the claimed invention was made." The substance of the improvement, i. e., elongation of rubber supports, is a mere change in the size, form or proportion of a patented device and cannot be labeled as patentable improvement. This comports as well with the opinion of the Patent Office Examiner.[16] The trial court's finding is in harmony with both the evidence and the law of this case.

Appellants argue that the issuance of '384 and '386 was delayed by Dresser Industries' participation in the interference without probable cause and with malice. The contention arises out of these facts. Read's application disclosed the resilient supports, in one form, as being progressively longer from the topmost support down. While the application was pending, the Examiner held that such form was disclosed in the specification and claims but was not fairly reflected in the drawings, and requested additional drawings to disclose this. Figures XIII and XIV were added and relied upon in the interference proceedings. Appellants argue that the addition was "new material" and improper and Dresser should be held accountable for the delay in issuance of Scaramucci's patents resulting from such action. The trial court properly analyzed the events and we adopt its holding as our own. After finding that Figures XIII and XIV were properly added to the application in good faith and in accordance with the requirements of the Examiner and the rules of the Patent Office, the court states: "In accordance with the Statutes and Rules of the Patent Office the Examiner in charge of both the Read and Scaramucci applications suggested claims for copying from the Scaramucci applications in the Read applications for

16. See note 4, *supra.*

purpose of setting up an interference. Read in good faith copied such claims as provided by the Statutes and Rules of Practice of the Patent Office. * * * Read copied said claims in good faith believing that the disclosures in the Read application would read on the claims and was done to protect his rights in the matter."

■ Appellants also contend that the trial court abused its discretion in denying a jury trial. There is no argument but that the request was beyond the time limits of Rule 38(b), F.R.Civ.P., 28 U.S.C.A. The assertion is that since demand was made six months prior to trial, there would have been no delay in going to trial, and the court's failure to acquiesce was an abuse of discretion resulting in a deprivation of appellants' constitutional rights. As appellee correctly points out, appellants failed in their notice of appeal to include this as a portion of the lower court's judgment from which they were appealing. Rule 3(c), F.R.App.P., 28 U.S.C.A., provides in pertinent part that the notice of appeal "shall designate the judgment, order or part thereof appealed from * * *." The provision in the Rule constitutes a mandatory requirement and the jurisdiction of this court on appeal is limited to review of the judgment or portion thereof designated.[17] Even if this deficiency were not present, we would not reverse on this basis. Appellants' failure to timely request a jury waived the constitutional right.[18] The appellants have attempted to put the onus of their failure on the trial court by saying the only reason given by the court below for its denial of a jury trial was that the request was not made within the time limits of Rule 38(b). Rule 39(b) permits a court, in its discretion, to order a jury trial after waiver. There has been no attempt here to establish abuse of discretion by the trial court and in our own independent search we have found none.

We have considered at length every one of the other arguments made by appellants on this appeal. Most of them have been touched upon in disposing of the issues heretofore decided; the others are deemed unmeritorious and would only unduly lengthen this opinion.

Affirmed.

---

17. *See* Gannon v. American Airlines, 251 F.2d 476 (10th Cir. 1958); Long v. Union Pacific Rd. Co., 206 F.2d 829 (10th Cir. 1953).

18. Rule 38(d), F.R.Civ.P., 28 U.S.C.A.